UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Plaintiff,

    v.                                  Case No. 14-CV-1019

ORION ENERGY SYSTEMS, INC.,

        Defendant.

---

## DECISION AND ORDER

---

      The Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(d)(4)(A), generally prohibits employers from requiring employees to undergo medical examinations and disability-related inquiries. Plaintiff Equal Employment Opportunity Commission (EEOC) brought this action against Defendant Orion Energy Systems, Inc. (Orion) alleging Orion violated the ADA by requiring employees who elect to enroll in Orion's self-insured health insurance plan to either complete a health risk assessment (HRA) or pay 100 percent of their monthly premium amount. The EEOC also alleges that Orion violated the ADA's anti-retaliation provisions, 42 U.S.C. § 12203(a) and (b), by instructing former employee Wendy Schobert not to discuss her concerns about the legality of this requirement with co-workers and by terminating Schobert's employment shortly after she voiced opposition to and opted out of Orion's new employee wellness program. Federal jurisdiction exists pursuant to 28 U.S.C. § 1331.

      The case is before the Court on the parties' cross motions for summary judgment. The EEOC argues that it is entitled to summary judgment on liability because Orion's policy violates the

ADA as a matter of law. The EEOC also argues that the undisputed evidence shows that Orion terminated Schobert in retaliation for her criticism of Orion's illegal policy and her refusal to complete a HRA. Orion, on the other hand, contends its requirement that employees who elect to receive health insurance from Orion either participate in the wellness program or pay the full premium amount was lawful under the ADA's insurance "safe harbor" provision. The safe harbor provision states in relevant part that the ADA "shall not be construed to prohibit or restrict" a self-insured organization "from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan." 42 U.S.C. § 12201(c)(3). Alternatively, Orion asserts that its wellness program is voluntary under 42 U.S.C. § 12112(d)(4)(B). Orion also argues the EEOC's retaliation claims fail as a matter of law given the fact that the wellness program Schobert was allegedly fired for opposing was not unlawful. For the reasons below, I find that the safe harbor does not apply but I agree with Orion that the wellness program is voluntary. However, I conclude that a factual dispute remains as to whether Orion retaliated against Schobert for exercising rights protected by the ADA, or interfered with Schobert's exercise or enjoyment of rights granted by the ADA. Accordingly, Orion's motion will be granted-in-part and denied-in-part, the EEOC's motion will be denied, and the case will be scheduled for trial.

## BACKGROUND

In 2008, Orion, a company that manufactures and sells energy-saving lighting solutions to commercial and industrial customers and employs some 250 people, decided to switch from a fully insured health plan to a self-insured health plan. Believing that a self-insured company can reduce or at least slow the increase of its health care costs by improving the health of its employees, Orion

2

also began exploring employee wellness programs with the assistance of a health insurance consulting company called Diversified Insurance Services.

Orion ultimately decided in the spring of 2009 on a wellness initiative including three components. Orion calls these components financial "incentives" while the EEOC calls them "penalties." In any event, employees who elected to enroll in Orion's plan would have to certify that they did not smoke or pay a surcharge ($80 per month for single coverage); they would have to exercise sixteen times per month on a range of motion machine located in Orion's fitness center or pay a surcharge ($50 per month); and, most importantly for purposes of this case, they would have to either complete a health risk assessment (HRA) at the beginning of the insurance year or pay the entire monthly premium equivalent amount, which was $413.43 for single coverage, $744.16 for limited family coverage, and $1,130.83 for family coverage. Employees who completed the HRA paid no premium equivalent, but still had to pay their own deductibles, co-pays and out-of-pocket expenses.

The HRA consists of a health history questionnaire and biometric screen involving a blood pressure check, height, weight, and body circumference measurement, and blood draw and analysis. Orion characterizes the HRA as a "mini-physical." Orion did not receive any personally identified information as a result of the HRA. Instead, the questionnaire and blood samples were collected by one vendor (Holy Family Memorial) and sent directly to another vendor (Clinical Reference Lab) with scores then compiled and aggregated by another vendor (Healics). Orion then obtained the information but only in an anonymous format. The anonymous, aggregated data allowed Orion to see the percentage of participants in its plan who had particular health risks such as high cholesterol. The form completed by participants in the HRA stated that these vendors would be the only entities

3

with access to the individual medical results, and that these vendors considered employees' medical information Protected Health Information subject to the medical privacy provisions of the Health Insurance Portability and Accountability Act (HIPPA).

Orion claims the purpose of the aggregated data it received from the HRAs was to identify common health issues and offer employees educational tools or assistance to improve their health. Participants also receive their individual results from the HRAs, thereby giving them the opportunity to discuss any issues with their physician. The program was intended, according to Orion, to improve the collective health and productivity of its workforce and also to reduce Orion's health care spending.

Wendy Schobert was an employee in Orion's accounting department from 2003 until May 18, 2009 when her employment was terminated. Before ultimately opting out of the HRA in April 2009, Schobert raised questions about the new wellness initiative, including the HRA. Schobert questioned whether medical information collected in the HRA would remain confidential. Schobert also questioned how the premium amount was calculated, and believed it was excessive in light of the service fee Orion was paying its third-party administrator, Auxiant. Schobert only knew the amount of that fee, Orion contends, because her job duties involved paying Auxiant's invoices.

Due to privacy concerns about the manner in which Orion was conducting the HRAs, Schobert sent a letter to Orion's human resources director, Kari Tylke, stating that she elected not to participate in the HRA. About two weeks later, on April 15, 2009, Schobert was offered the opportunity to undergo the HRA at Holy Family Memorial's facility (instead of on Orion's premises where the initial HRA was scheduled), but Schobert declined. On April 24, 2009, Schobert signed an Opt-Out form, indicating, "I have voluntarily made the choice to not participate in the HRA

4

program, and as a result, I understand and agree that I will be responsible to pay Orion for the applicable monthly premium cost during the period from April 1, 2009 through February 28, 2010." For Schobert, the applicable monthly premium cost was $413.42, if she elected Orion's health insurance plan. Schobert was the only Orion employee who opted out of the HRA in the spring of 2009.

Orion states that sometime around April 2009, Schobert was "talked to" by her supervisor, Caryn Boegel, and Tylke, the HR director. The conversation concerned comments Schobert had made to co-workers regarding the amount of the premium being charged by Orion in light of the administrative service charge paid to Auxiant. Schobert claims she was told during this meeting to keep her opinions about the new wellness program to herself. Tylke testified in deposition that Boegel had raised concerns that Schobert's "negativity" would bring down morale in Boegel's group of employees, and that Schobert was told in this meeting that such negativity was not welcome in the workplace, and that if Schobert had concerns, she needed to speak with a supervisor, Tylke, or someone else in management. (Dep. Tr. 45, ECF No. 36-5.)

On May 7, 2009, Schobert sent an e-mail challenging and criticizing then Orion chief executive officer Neal Verfuerth's request for information on how much time employees were using to get water and coffee in light of what Schobert believed were Orion's extravagant spending decisions on a variety of projects. Orion contends that a few days after this email was sent, Verfuerth instructed Scott Jensen, Orion's chief financial officer, to terminate Schobert's employment. Jensen testified in deposition that Verfuerth told him to fire Schobert because Verfuerth "expected his accounts payable person to process invoices and cut checks" not to "question how the company chooses to spend money." (Tr. 18:6–9, ECF No. 36-2.) Jensen then

5

informed Boegel to implement the termination, which was discussed with Tylke about a week before it occurred. Schobert's employment was terminated in a meeting on May 18, 2009 with Mike Potts, the executive vice president, as well as Boegel and Tylke.

## LEGAL STANDARD

Summary judgment must be granted where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ANALYSIS

Title I of the ADA is aimed at eliminating disability-based discrimination in the workplace. 42 U.S.C. §§ 12101(b)(1), 12112(a). Section 12112(a) states the general rule, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." The prohibition extends also to employer-required "medical examinations and inquiries." 42 U.S.C. § 12112(d)(1). "The obvious purpose of subsection (d) is to limit the gathering and use of medical information as one of the ways to reduce the possibility of discrimination." *Heston v. Underwriters Labs., Inc.*, 297 F. Supp. 2d 840, 845 (M.D. N.C. 2003).

Section 12112(d)(4)(A), which the EEOC claims Orion violated, states that a covered entity "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless

6

such examination or inquiry is shown to be job-related and consistent with business necessity." Section 12112(d)(4)(B), however, permits employers to conduct "voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site." The EEOC argues the HRA was not "voluntary" under (d)(4)(B) given that Orion shifted 100 percent of the health benefit premium to employees who opted out, and also given that Schobert was fired three weeks after opting out.

Orion argues its wellness initiative did not violate § 12112(d)(4)(A) for three reasons: (1) the ADA's safe harbor relating to insurance, 42 U.S.C. § 12201(c), applies to the challenged aspects of the wellness program; (2) Orion did not "make inquiries" as prohibited by (d)(4)(A) where Orion received only anonymous, aggregated employee responses and results from the HRA;[1] and (3) the wellness program was voluntary because Orion's employees had a choice regarding whether to participate and sufficient time to make that choice. For the reasons below, I find that the safe harbor does not apply but find that the wellness program was voluntary. I therefore decline to address Orion's alternative arguments.

I.      WELLNESS PROGRAM

        A. SAFE HARBOR PROVISION

        Orion argues the challenged aspects of the wellness program were lawful under the ADA's "safe harbor" provision relating to insurance. The safe harbor provides in full:

---

[1]Orion's second argument is based on the Oregon Court of Appeals' decision in *Patten v. State*, 359 P.3d 469 (2015), in which the court concluded that the word "inquiries" was ambiguous in the context of an anonymous health risk questionnaire where the employer received only aggregated employee responses. Given the perceived ambiguity and in light of the ADA's purpose to prohibit disability discrimination by employers, the court concluded that the anonymous questionnaires were not prohibited by § 12112(d)(4)(A).

7

(c) Insurance

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

> (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

> (3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III.

42 U.S.C. § 12201(c).

Orion relies on *Seff v. Broward County*, 691 F.3d 1221 (2012), and *EEOC v. Flambeau, Inc.*, 131 F. Supp. 3d 849 (W.D. Wis. 2015), to argue that it is protected by the safe harbor provision. In *Flambeau*, the EEOC challenged a similar program by a self-insured employer which conditioned employee participation in its health insurance plan on the employees' completion of a health risk assessment and a biometric screening test. Addressing an issue of first impression in this circuit, the district court granted the employer's motion for summary judgment, relying on the Eleventh Circuit's decision in *Seff*, and concluded that the protections set forth in the ADA's safe harbor enable employers to design insurance benefit plans that require otherwise prohibited medical examinations and inquiries as a condition of enrollment in an insurance plan, without violating § 12112(d)(4)(A). 131 F. Supp. 3d at 851.

8

The EEOC argues *Flambeau* and *Seff* were wrongly decided. In fact, the EEOC has now created a new regulation in which the EEOC purports to "repudiate[] the reasoning" in these cases. (EEOC's Notice of Supp. Authority at 4, ECF No. 47-1.) In no uncertain terms, the new regulation states: "The 'safe harbor' provisions in section 1630.16(f) of this part [which restates the safe harbor provisions in 42 U.S.C. § 12201(c)] applicable to health insurance, life insurance, and other benefit plans <u>do not apply to wellness programs, even if such plans are part of a covered entity's health plan</u>." 29 C.F.R. § 1630.14(d)(6), published at 82 Fed. Reg. 31140, effective July 18, 2016 (emphasis added). What's more, the EEOC maintains that because the new regulation merely "clarifies the prior regulations," it applies retroactively to Orion's wellness program, and because the regulation is authorized by statute, 42 U.S.C. § 12116, it is entitled to "substantial deference" under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984) and *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 229 (2001). (EEOC's Notice of Supp. Authority at 4–5, ECF No. 47-1.)

A court applies *Chevron* deference to an agency's regulation when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27; *see also Brumfield v. City of Chicago*, 735 F.3d 619, 625–26 (7th Cir. 2013). The EEOC asserts authority to interpret the safe harbor provision because "by its express terms, the provision applies to Titles I through IV of the ADA." *See* 81 Fed. Reg. at 31130. Orion relies on the EEOC's enabling statute, 42 U.S.C. § 12116, to challenge the EEOC's authority to interpret the safe harbor provision. Section 12116 states that "the Commission shall issue regulations in an accessible format to carry out this subchapter." 42 U.S.C. § 12116. Orion argues that the EEOC's

9

authority to regulate stops at Title I and that it cannot issue regulations pertaining to the safe harbor provision contained in Title IV of the ADA. However, the line is not as clearly drawn as Orion suggests, and Congress' intention to either limit or expand the EEOC's regulatory authority is ambiguous.

In determining whether Congress delegated rulemaking authority to an agency, "the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington v. FCC*, --- U.S. ---, 133 S. Ct. 1863, 1871 (2013). The ADA does not foreclose the EEOC from interpreting the provisions of Title IV's applicability to Title I or limit the EEOC's authority to creating regulations that solely interpret Title I. Rather, Congress authorized the EEOC to create regulations to carry out the provisions in Title I, which includes ensuring that covered entities do not discriminate against individuals on the basis of a disability by conducting medical examinations and inquiries that are not job-related or consistent with business necessity. Specifically, publishing a regulation clarifying that the safe harbor provision in Title IV does not apply to medical examinations and inquiries taken in connection with a health program regulated in Title I is not beyond the scope of the EEOC's delegated authority. *Chevron* deference applies to an agency's interpretation of a statutory ambiguity concerning the scope of the agency's rulemaking authority. *City of Arlington*, 133 S. Ct. at 1871–72. Because the ADA is ambiguous regarding the reach of the EEOC's delegated authority, and the EEOC's interpretation of its authority is reasonable and consistent with the structure of the Act, the court must defer to the EEOC's interpretation of its rulemaking authority.

Orion argues that even if the EEOC has authority to create the new regulation, *Chevron* deference is not owed to the regulation because it is manifestly contrary to the statute. (Def.'s Resp.

10

Br. Opposing EEOC's Mot. to file Notice of Supp. Authority at 6, ECF No. 48.) In reviewing the regulation, the court must employ the *Chevron* two-step analysis. The court must first determine whether Congress spoke directly to the question at issue. *Chevron*, 467 U.S. at 842–43; *see also Brumfield*, 735 F.3d at 626. If Congress did in fact speak to the precise question at issue, the court must give effect to the statute's unambiguous language and end the inquiry, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If, however, Congress was silent or ambiguous, the agency's interpretation of the statute must be upheld if it is based on a permissible or reasonable construction of the statute. *Id.* at 843. The court need not conclude that the agency's construction was the "only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11.

Here, Congress did not speak unambiguously to the precise question at issue: whether safe harbor immunity applies to involuntary medical examinations required as part of a wellness plan. The safe harbor provision was enacted to ensure Titles I through III of the ADA were not construed to restrict the basic business operations of insurance companies. 42 U.S.C. § 12201(c); *see also* E. Pierce Blue, *Wellness Programs, the ADA, and GINA: Framing the Conflict*, 31 HOFSTRA LAB. & EMP. L.J. 367, 378 (2014). Nonetheless, the provision does not address its effect on involuntary medical examinations or inquiries prescribed by a wellness plan. Therefore, the statute is ambiguous on the question at issue. As such, the EEOC's regulation must be upheld if it has "promulgated a reasonable interpretation of the statute." *Brumfield*, 735 F.3d at 626.

In this case, the EEOC's interpretation is reasonable. The EEOC argues that the ADA's legislative history and the statute's language itself provide that safe harbor immunity does not apply

11

to wellness plans that require involuntary medical examinations and inquiries. Under Title I, an employer cannot demand that an employee complete medical examinations or inquiries that are not job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A). However, these medical examinations are permitted so long as they are voluntary and part of an employee health program. 42 U.S.C. § 12112(d)(4)(B). The EEOC argues that the ADA does not reflect any intention to allow the safe harbor provision to limit Title I's protections against involuntary medical examinations in wellness programs. 81 Fed. Reg. at 31130–31. Accordingly, the EEOC determined Congress did not intend for the safe harbor provision to apply to 42 U.S.C. § 12112(d)(4)(B). *Id.* The EEOC's interpretation of 42 U.S.C. § 12201(c) as it relates to Title I is a permissible construction of the statute.

The EEOC further declares that the regulations regarding the safe harbor provision and wellness programs are retroactive. Orion argues that the EEOC regulation cannot be applied retroactively because it attempts to change the substantive law. Generally, new regulations that merely restate what the law according to the agency is and has always been may apply retroactively, while new regulations that change the substantive state of the law may not. *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001). In determining whether a rule constitutes a change or clarification, "the intent of the promulgating agency must be accorded great weight." *Beller v. Health & Hosp. Corp. of Marion Cnty.*, 703 F.3d 388, 391 (7th Cir. 2012). As such, courts will defer to an agency's expressed intent that a regulation is a clarification "unless the prior interpretation of the regulation is 'patently inconsistent' with the later one." *Id.* Here, the EEOC considered the 2016 regulation to be a clarification of existing law. The final rule clarifies that the safe harbor defense does not apply to medical examinations and inquiries taken in connection with a wellness program, even if the

12

program is part of a covered entity's health plan. 81 Fed. Reg. at 31140. Moreover, the new regulation is not inconsistent with prior EEOC positions regarding the safe harbor provision.

Orion asserts that the regulation attempts to change the substantive law. Where a regulation addresses a particular issue contrary to a decision from a federal court of appeals, the new regulation is said to change the substantive law in the circuit previously governed by the court of appeals' decision as well as in circuits where the court of appeals has not addressed the issue, as is the case here. *Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002) ("Less obviously, the regulations preclude the courts in other circuits from adopting the view of their sister court rejecting the Secretary's position, a possibility that was still available when the cases were initially filed."). However, the Eleventh Circuit's decision in *Seff* is not "authoritative" because the only issue there was whether the wellness program was a "term" of the plan. As this was the only issue raised on appeal, it did not discuss whether the safe harbor provision should apply to wellness programs at all. The issue addressed in the EEOC's regulation and in this case has not been substantively analyzed by any circuit court. The regulation simply clarifies rather than changes existing law. Accordingly, the EEOC's regulation is a permissible interpretation of the statute and can be applied retroactively.

Even without relying on the regulation, the safe harbor provision does not apply to Orion's wellness initiative. The safe harbor says the ADA shall not be construed to restrict or prohibit an organization from establishing, sponsoring, observing, or administering the terms of a bona fide insurance benefit plan that are based on underwriting risks, classifying risks, or administering such risks. 42 U.S.C. § 12201(c)(1), (2). In *Seff*, an employee filed an ADA claim against Broward County, Florida alleging its wellness policy, which required employees to pay a $20.00 charge for declining to participate in an HRA, constituted an unlawful medical examination under the ADA.

13

778 F. Supp. 2d 1370, 1370 (S.D. Fla. 2011). The district court concluded the county's wellness program was a term of a bona fide benefit plan falling under the safe harbor provision because the plan was "designed to develop and administer present and future benefits plans using accepted principles of risk assessment." *Id.* at 1374. The court reasoned that although the county was not underwriting or classifying risk on an individual basis, it was "underwriting and classifying risks on a macroscopic level so it may form economically sound benefit plans for the future." *Id.* On appeal, the Eleventh Circuit affirmed that the wellness program was a term of the county's health plan. *Seff*, 691 F.3d at 1223. The Eleventh Circuit, however, did not address the district court's application of the safe harbor provision to the wellness program. *Id.*

The district court in *Flambeau* later adopted the Eleventh Circuit's reasoning to conclude that requiring employees to complete a health risk assessment as a condition of participating in the employer's self-insured benefit plan was clearly a "term" of such plan. 131 F. Supp. 3d at 855 ("[P]laintiff's entire claim is premised on its undisputed allegation that defendant's employees were required to complete the wellness program before they could enroll in the plan. It is difficult to fathom how such a condition could be anything other than a plan term."). The court also concluded that the wellness program requirement was "clearly intended" to assist with underwriting, classifying, or administering risks associated with the insurance plan, noting that the defendant's consultants used the data gathered through the wellness program to classify participants' risks, calculate defendant's projected insurance costs, provide recommendations regarding what to charge participants for medication and preventive care, make recommendations regarding plan premiums, including recommending a surcharge on smokers, and deciding to purchase stop-loss insurance against unexpectedly large claims. "These types of decisions are a fundamental part of developing

14

and administering an insurance plan and therefore fall squarely within the scope of the safe harbor." *Id.* at 856.

Based on the safe harbor provision's purpose as well as the language and structure of the ADA, I decline to adopt the holdings of *Seff* and *Flambeau*. The broad reading of 42 U.S.C. § 12201(c) in these decisions is at odds with the statute's intended purpose. The safe harbor provision is a limited exception that was created "to protect the basic business operations of insurance companies." Blue, *supra* at 378; *see also* H.R. Rep. 101-485(III), 101st Cong. 2d Sess. 1990, *reprinted in* 1990 U.S.C.C.A.N. 445, 493–94 ("The Committee added [the safe harbor] provision because it does not intend for the ADA to affect legitimate classification of risks in insurance plans, in accordance with state laws and regulations under which such plans are regulated."). Generally, wellness programs are unrelated to basic underwriting and risk classification. *Id.* at 379. During the underwriting process, an insurance company reviews data and conducts actuarial rate-making analysis to determine the premium amounts it will charge an individual or company to receive coverage. *Id.* The implementation of a wellness program usually occurs after the insurance company establishes the premium and is "one step removed from basic underwriting." *Id.*

Here, the wellness program was not used to underwrite, classify, or administer risk. Orion adopted the wellness program in 2009 separately from the terms of its health benefit plan and did not amend its health benefits summary plan to include the wellness initiative. (Pl.'s Supplemental PFOF ¶ 60, ECF No. 35.). Employer-sponsored health plans are subject to ERISA's amendment procdures. *See* 29 U.S.C. § 1022. Any employee benefit plan must contain a summary plan description that is provided to all participants. *Id.* The summary plan description must explain the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." *Id.*

15

Any material modification in the terms of a health benefit plan shall be provided to employees in writing in the summary plan description. *Id.* Orion was not required to amend its summary plan description because participation in its wellness program was not a condition precedent for an employee to receive heath benefits through Orion's insurance plan. *Cf.*, *Flambeau*, 131 F. Supp. 3d at 851 (Defendant required employees to complete the HRA only if they wanted to participate in the company's insurance plan.). If an employee refused to complete the HRA and participate in the wellness plan, she could still be a member of Orion's insurance plan, provided she pay the full premium amount. In short, Orion's wellness program was wholly independent from its insurance plan.

What's more, Orion did not use the information it obtained through the wellness initiative to determine the premiums it would charge or determine coverage under the health benefit plan. (Pl.'s Supplemental PFOF ¶¶ 34–35, ECF No. 35.) While Orion sought to develop a wellness program to help employees improve their health or to benefit economically by mitigating its health insurance costs, it did not perform any underwriting or risk classification for the purpose of calculating insurance premiums for the HRA. Only in the broadest sense is Orion's wellness initiative related to insurance. Adopting *Flambeau*'s expansion of the safe harbor provision to employers providing wellness plans goes well beyond the provision's narrow scope. *See* 29 C.F.R. app. § 1630.16(f) (The insurance safe harbor provision "is a limited exception that is only applicable to those who establish, sponsor, observe or administer benefit plans . . . ."). In short, applying the safe harbor provision to Orion's wellness initiative is contrary to the purpose of the provision.

Moreover, *Seff* and *Flambeau*'s broad interpretation of the safe harbor provision effectively reads 42 U.S.C. § 12112(d)(4)(B)—the provision that allows an employer to conduct <u>voluntary</u>

16

medical examinations as part of an employee health program—out of the ADA.  Blue, *supra* at 381.  By applying the safe harbor provision to employer wellness programs, the ADA would not prevent employers from requiring medical examinations as a condition to participate in its wellness program so long as the exams tangentially pertain to health benefits.  As such, the statute providing an exception for voluntary medical inquiries is mere surplusage.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).  In sum, Orion's wellness initiative is not exempt from the ADA under the safe harbor provision, 42 U.S.C. § 12201(c).

### B. VOLUNTARY EXAMINATION AND INQUIRY

Even if Orion's wellness initiative is not immune under the safe harbor provision, Orion argues its initiative is voluntary.  (ECF No. 30 at 19.)  Again, an employer cannot conduct a medical examination or make medical inquiries of an employee, "unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  However, a medical examination or inquiry that is "voluntary" and part of a health program does not violate the ADA.  *See* 42 U.S.C. § 12112(d)(4)(B).

Congress has not defined what constitutes a "voluntary" medical examination or inquiry.  The EEOC's new regulation instructs that medical examinations and histories are "voluntary" when the employer does not (1) require employees to participate; (2) deny coverage under any group health plan to employees for non-participation; and (3) take any adverse action, retaliate against, or coerce employees who choose not to participate.  81 Fed. Reg. at 31133.  If an employer wishes to incentivize or penalize employees' participation, the program remains voluntary if the employer

17

Case 1:14-cv-01019-WCG   Filed 09/19/16   Page 17 of 21   Document 51

provides a financial incentive at or below thirty percent of the total cost for self-only coverage. *Id.* at 31134. However, the EEOC does not maintain those aspects of the regulation apply retroactively. *Id.* at 31126.

Instead, the EEOC argues even apart from its new regulation that the wellness program is involuntary because shifting 100 percent of the premium cost to an employee who opted out of a program is so substantial that Orion's offer to pay the health benefit premium in exchange for the employee's participation in the program is more than a mere incentive. But even a strong incentive is still no more than an incentive; it is not compulsion. Orion's wellness initiative is voluntary in the sense that it is optional. An employee is not required to participate in the program and is instead given a choice: either elect to complete the HRA as part of the health program or pay the full amount of the health benefit premium. A corporation is not required to fully pay for an employee's health insurance—indeed, it is not required to provide health insurance at all—and it is not unlawful to give an employee a choice regarding her health benefits provided the choices are among lawful alternatives. There may be strong reasons to comply with an employer's wellness initiative, and the employee must balance the considerations in deciding whether to participate or not. But a "hard choice is not the same as no choice." *See United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000). Schobert made a choice about what was truly important to her. She chose to forego the medical examination and pay the full amount of her health benefit premium. This choice may have been difficult, but is a choice nonetheless. Sometimes hard choices need to be made. Orion conducted voluntary medical examinations as part of its employee health program pursuant to 42 U.S.C. § 12112(d)(4)(B). Accordingly, Orion is entitled to summary judgment as to the EEOC's claim that the wellness program, including the HRA, violated § 12112(d)(4)(A).

18

## II.    RETALIATION AND INTERFERENCE CLAIMS

Orion also argues that the EEOC's retaliation and interference claims fail as a matter of law given the conclusion that the wellness initiative was lawful. Specifically, Orion argues the EEOC's claims fail because Schobert was not engaged in any protected activity by complaining about aspects of the program that were lawful. A retaliation claim under the ADA, just as under Title VII, requires (1) a protected activity, (2) an adverse employment action, and (3) a causal connection between the protected activity and adverse employment action. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (quoting *Burks v. Wis. Dep't of Trans.*, 464 F.3d 744, 758 (7th Cir. 2006)).

Orion cites cases standing for the proposition that an employee who complains about a type of discrimination that is not prohibited by the law at issue (Title VII or ADA) is not engaged in a protected activity for purposes of a retaliation claim under the same law. *See, e.g.*, *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 706–07 (7th Cir. 2000). This is no doubt a sound principle because the ADA's retaliation provision does not protect an employee's right to complain generally, but to complain about or oppose practices that are unlawful under the ADA. 42 U.S.C. § 12203(a). On the other hand, it is well established that an employee may engage in protected activity even if the challenged practice is not actually illegal, so long as the employee has a sincere and reasonable belief that she is opposing an unlawful practice. *Hamner*, 224 F.3d at 707 (citing *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir. 1989)). For example, an employee may complain about sexual harassment (a type of prohibited discrimination under Title VII) where the underlying conduct was not actually severe enough to be actionable. If the employee sincerely and reasonably believed the conduct was severe enough to be actionable, the employee was

19

engaged in a protected activity. *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008).

Here, it is undisputed that Schobert expressed concern about the confidentiality of her medical information under the new wellness initiative. As that is a legitimate concern under the ADA, i.e., something the ADA actually does govern, her expression may have been protected. Moreover, Schobert decided to opt out of the HRA. Orion does not argue it could have required Schobert to participate in the HRA on pain of termination of employment, only that the HRA was not involuntary because employees could pay the full premium or elect not to obtain insurance under Orion's plan. In other words, Schobert's opting out of the HRA appears to be a protected activity. Given the conflicting evidence regarding who actually decided to terminate Schobert and why, and the timing of her termination, a fact question remains as to whether there was any causal link between Schobert's protected activity and her termination. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied.").

Schobert also claims she was flat out told not to share her opinion about the new wellness program with her coworkers. A jury could reasonably conclude Orion thereby interfered with Schobert's exercise or enjoyment of her rights or interfered with her aiding or encouraging of others in the exercise or enjoyment of rights granted under the ADA, in violation of § 12203(b). It may turn out that Orion only instructed Schobert not to spread inaccurate information or confidential information to her coworkers, either of which would not be improper on Orion's part, but these are not proper issues for summary judgment and instead will be issues to be decided by a jury.

20

For these reasons, Orion is not entitled to summary judgment as to the EEOC's retaliation and interference claims.

## CONCLUSION

Accordingly, the EEOC's motion for summary judgment is denied; Orion's motion for summary judgment is granted-in-part and denied-in-part as described above; and the EEOC's motion to supplement is granted. The Clerk is directed to set this matter on the Court's calender to schedule the case for trial.

**SO ORDERED** this __19th__ day of September, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

21